IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

MADDRICE P. GANGES,

           Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

           Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 17-1982 (JBS)

**OPINION**

---

APPEARANCES:

Richard Lowell Frankel, Esq.
BROSS & FRANKEL, PA
102 Browning Lane, Building C-1
Cherry Hill, NJ 08003
    Attorney for Plaintiff

Heather Tashman Fritts, Special Assistant U.S. Attorney
Naomi B. Mendelsohn, Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
300 Spring Garden Street, 6th Floor
Philadelphia, PA 19123
    Attorneys for Defendant

**SIMANDLE**, District Judge:

## I.   INTRODUCTION

This matter comes before the Court pursuant to 42 U.S.C §

405(g) for review of the final decision of the Commissioner of

the Social Security Administration ("SSA") denying the

application of Plaintiff Maddrice P. Ganges ("Plaintiff") for

Social Security Disability Benefits and Supplemental Security

Income under Title II and XVI of the Social Security Act, 42

U.S.C. § 401 et. seq. Plaintiff, who suffers from lumbar degenerative disc disease, left shoulder impingement, left knee and right knee pain, cardiac condition, fibroids, cysts, diabetes, and gall bladder issues, was denied benefits for the closed period of disability from February 1, 2011, the amended onset date of alleged disability, to January 11, 2013, the date on which Plaintiff returned to substantial work.

In the pending appeal, Plaintiff contends that the July 17, 2015 decision of Administrative Law Judge ("ALJ") Keith Bossong should be reversed and remanded on five grounds. First, Plaintiff argues the ALJ erred by failing to follow SSA policy regarding the procedure when a claimant is unavailable to attend a hearing before the ALJ but her representative is present. Second, Plaintiff argues the ALJ failed to properly consider several "non-severe" impairments in determining the Plaintiff's Residual Functional Capacity ("RFC"). Third, Plaintiff argues the ALJ failed to properly evaluate Plaintiff's bilateral hand complaints. Fourth, Plaintiff argues the ALJ misinterpreted the results of a May 24, 2011 Functional Capacity Evaluation. Finally, Plaintiff argues the ALJ improperly rejected the opinion of Plaintiff's treating orthopedic surgeon. For the reasons that follow, the Court will affirm the ALJ's well-reasoned and thorough decision.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed an application for Social Security Disability Benefits on or around September 13, 2012 (R. 176-77), and an application for Supplemental Security Income on or around September 24, 2012 (R. 178-83), initially alleging that she was disabled as of December 28, 2009. (R. 195.) Plaintiff subsequently amended her claim to a closed period from February 1, 2011 to January 11, 2013. (R. 239-40.)

Plaintiff's claim was denied by the SSA on February 6, 2013. (R. 114-19.) Her claim was again denied upon reconsideration on July 8, 2013. (R. 127-31.) A hearing was held before ALJ Bossong on March 10, 2015; as discussed in more detail below, Plaintiff's attorney and representative, Mr. Richard Frankel, Esq., was present, but Plaintiff was not. (R. 55-70.) The ALJ issued an opinion on July 17, 2015, denying Plaintiff benefits for the closed period. (R. 21-49.) On January 19, 2017, the Appeals Counsel denied Plaintiff's request for review. (R. 1-5.) This appeal timely follows.

### B. Personal and Medical History

As Plaintiff alleges a closed period of disability between February 1, 2011 and January 11, 2013, the Court only discusses those facts most relevant to this period. Plaintiff was 43 years old at the time of her amended alleged disability onset date and

45 years old when she returned to substantial work.[1] (R. at 176, 239-40.) Plaintiff graduated from high school and attended two years of college. (R. at 196.) From 1989 until 2009, she worked as a security guard at a hospital and casino. (R. at 59-61, 196.) Between 2009 and 2011, Plaintiff "continued to work on and off" (R. at 58) and in 2012 she briefly attempted to return to work. (R. at 185-88.) On or around January 11, 2013, Plaintiff returned to substantial work as a security guard for Marion Security Agency. (R. at 240.)

      1.   <u>Plaintiff's 2009 injury and subsequent testing and treatment</u>

On July 10, 2009, Plaintiff suffered a fall while at work and sustained injuries to her left knee, left shoulder, and the left side of her neck. (R. at 58, 247.)

An August 4, 2009 MRI of Plaintiff's left knee showed findings consistent with chondromalacia, moderate joint effusion, and a vertical tear within the anterior horn of the lateral meniscus. (R. at 368-69.) Shortly thereafter, Plaintiff underwent left knee arthroscopic repair of the medial and lateral meniscus. (R. at 384-85.) At a September 24, 2009 follow-up visit, Dr. Jeffrey Malumed, M.D. observed Plaintiff is "doing better with her knee," "has good range of motion," and

---

[1] Accordingly, Plaintiff was a "younger person" under the relevant SSA regulations during the closed period. 20 C.F.R. §§ 404.1563(c), 416.927(c).

"[t]herapy is helping her," and determined that "[s]he may continue working on a light duty basis." (R. at 380-81.) On October 8, 2009, Dr. Malumed again examined Plaintiff and noted that she had a full range of motion and her therapy had gone well, but that she had a little bit of fluid in the knee, which he expected. (R. at 378.) At Plaintiff's request, Dr. Malumed gave her one more week before she returned to her normal job. (Id.)

On March 31, 2010, Plaintiff underwent a second knee surgery, this time a left knee medial meniscectomy, chondroplasty of the medial femoral condyle, partial synovectomy, and resection of the plica. (R. at 351.) In April 2010, Plaintiff began treating at NovaCare for physical therapy on the knee, as well as for the left hand, back, and spine. (R. at 305-09.) She continued working "on and off" until early 2011. (R. at 58.)

## 2. Impairments during closed period of alleged disability

Notwithstanding the July 2009 injury and subsequent testing and treatment described above, Plaintiff continued to work in some capacity until on or around February 1, 2011, the amended alleged onset disability date. (R. 239-40.)

On February 1, 2011, Plaintiff visited, Dr. Laura Ross, D.O. at Ross Center for Orthopedics. (R. at 428.) At this time, Dr. Ross evaluated Plaintiff and determined that Plaintiff had

"crepitus with range of motion" in the left knee and left shoulder. (Id.) It was Dr. Ross's impression that Plaintiff suffered from "[l]umbar [herniated nucleus pulposus] with left lower extremity radiculitis, left knee internal derangement with exacerbation of underlying degenerative joint disease, status post left carpal tunnel decompression and ulnar decompression at the elbow, and left shoulder impingement syndrome." (Id.) As a treatment plan, Dr. Ross recommended Flector patches, aquatic and land therapy for her left arm, left knee and back, a standing x-ray of her left knee, a hinged knee brace for her left knee, and pain management. (Id.) Dr. Ross also noted that Plaintiff would remain out of work pending an x-ray and consultation. (Id.)

A February 9, 2011 x-ray of Plaintiff's knee revealed she had mild osteophyte formation of the medial joint space and of the superior patella, that her patellofemoral joint was mildly narrowed, and she exhibited narrowing of both the medial and lateral joint spaces. (R. at 429.) The impression was that Plaintiff had mild degenerative changes of the joint and no fracture. (Id.)

On March 9, 2011, Plaintiff had surgery on her left shoulder (R. at 637) and, the following day, she underwent carpal tunnel decompression of the left wrist and left ulnar nerve decompression at the elbow. (R. at 401.) Dr. Ross saw

6

Plaintiff the following week and recommended that she go to physical therapy for her left shoulder. (R. at 443.) On May 12, 2011, Plaintiff returned to Dr. Ross who advised Plaintiff to continue home exercise and acupuncture for pain management and to go to physical therapy. (R. at 446.)

On May 24, 2011, Plaintiff underwent a Functional Capacity Evaluation ("FCE"), which was performed by Tate L. Rice, PT, DPT. (R. at 397-416.) The FCE showed that Plaintiff could perform at least eight hours of handling, fingering, feeling, balancing, stooping, kneeling, and sitting, but only five hours of crouching and lifting 10 pounds, four hours of crawling and lifting 20 pounds, and two hours of lifting 50 pounds. (R. at 402.) The FCE also showed that Plaintiff's grip strength was measured at 56 pounds on the left and 81 pounds on the right. (R. at 400). Based on the FCE, Mr. Rice opined that, because she was not able to lift objects over 10 pounds above her shoulder height, Plaintiff could not reassume her past relevant work as a Security Supervisor. (R. at 399.) According to Mr. Rice, however, Plaintiff was able to perform "light" work. (Id.)

On July 25, 2011, Plaintiff visited Dr. Mary Ann Sciamanna, D.O., for pain in her back, neck, left shoulder, and left elbow. (R. at 596-600.) Dr. Sciamanna noted that Plaintiff had good lumbar extension and her flexion measured to 90 degrees, but her side bending was painful. (R. at 596.) Plaintiff was diagnosed

with low back pain and Dr. Sciamanna recommended a course of acupuncture. (Id.) Plaintiff met with Dr. Sciamanna several times for treatment during August 2011 and reported on August 25, 2011 that her lower back was "doing pretty good," but that she still experienced some left elbow pain. (R. at 597-98.) On September 1, 2011, Plaintiff's neck and low back pain were "stable," and by September 8, 2011, Plaintiff reported that her pain was 70 percent better. (R. at 598-99.)

Starting in September 2010, Plaintiff attended physical and aqua therapy on several occasions. (R. at 467-70, 485-89, 510-36, 538-41.) On May 9, 2011, her physical therapist measured her lumbar flexion at 64 degrees, her extension at 26 degrees, her right lateral flexion at 22 degrees, and her left lateral flexion at 24 degrees. (R. at 540.) In August 2011, Plaintiff was discharged from aqua therapy because she met all of her goals. (R. at 489.)

On August 20, 2012, Plaintiff reported to Dr. Ross that she experienced sharp pain in her left knee, left shoulder, and back, but that Dr. Sciamanna had "helped her with regard to her back." (R. at 631.) It was Dr. Ross's impression that Plaintiff had impingement of the left shoulder, left knee degenerative joint disease, and lumbar degenerative disc disease, and that she was post left ulnar nerve decompression and left carpal

tunnel decompression. (Id.) At this time, Dr. Ross recommended that Plaintiff consider applying for disability (Id.)

Plaintiff returned to substantial work on or around January 11, 2013. (R. 239-40.)

### 3.   Plaintiff's Adult Function Report

On October 1, 2012, Plaintiff filled out an Adult Function Report in connection with her application for disability benefits. (R. 209-16.) In this Report, Plaintiff stated that she had difficulty sleeping due to muscle spasms and aches in her legs, arm, and shoulder, and that it took her ten to fifteen minutes to get out of bed in the morning. (R. at 209-10.) She indicated that she used to be able to "do anything," including sports, hiking and climbs, but that, because of her shoulder, knee, and back conditions, she had difficulty dressing and bathing, could no longer do her hair, and that she could only sit for fifteen to thirty minutes before having to move, only walk ten to fifteen minutes before having to stop and rest, and only concentrate for fifteen to thirty minutes at a time. (R. at 210, 214.) Plaintiff also indicated that she could feed herself, use the toilet without limitations, prepare simple meals, wash laundry (but not pick up the basket), drive a car, shop for groceries (but not carry the groceries herself), handle personal finances, read, watch television, and use the computer. (R. at 209, 211-12.)

## 4. Dr. Ross's Medical Source Statement

In September 2013, several months after Plaintiff returned
to substantial work, Dr. Ross completed a Medical Source
Statement ("MSS") on Plaintiff's behalf. (R. at 779-87.) In her
MSS, Dr. Ross identified Plaintiff's left shoulder, elbow, back,
and foot/ankle, and her bilateral hands as areas of
musculoskeletal pain, in addition to other symptoms, including
fatigue, general malaise, extremity numbness, pain, and/or
tingling, difficulty walking/abnormal gait, muscle weakness,
muscle spasm, loss of manual dexterity, swelling, difficulty
thinking/concentrating/ maintaining attention, depression, and
recent weight loss. (R. at 779.) Dr. Ross opined that
Plaintiff's pain was occasionally "profound and intractable,"
usually present, and of such a degree as to prevent Plaintiff
from performing normal, full-time work activities on a frequent
basis. (R. at 780.) She further opined that medications would
prevent Plaintiff from performing even the most simple work
tasks and that Plaintiff would need to lie supine for two hours
during the day on a daily basis, could sit for less than two
hours in an eight-hour work day, could stand or walk for up to
one hour in an eight-hour work day, would need to elevate her
legs two to four times a day, could rarely lift less than 10
pounds, could rarely use her left hand or arm and never use her
right arm to reach, could rarely handle objects and never finger

with her right hand, and would be absent from work more than four days per month. (R. at 781-87.)

### 5. State agency consultants

On January 13, 2013, Dr. James Paolino, M.D., a state agency consultant, reviewed Plaintiff's medical records and concluded that Plaintiff could carry lift or carry 20 pounds occasionally and 10 pounds frequently, could stand or walk for three hours in an eight-hour workday, sit for six hours in an eight-hour work day, occasionally climb ramps and stairs, balance, and stoop. (R. at 77-80.) Dr. Paolino also determined that Plaintiff could not climb ladders, ropes, or scaffolds, kneel, crouch or crawl, was limited in reaching with the left upper extremity, must avoid concentrated exposure to extreme heat, cold, wetness, and humidity, and must avoid all exposure to pulmonary irritants. (Id.) On July 12, 2013, a different state agency consultant, Dr. Andrew Przybyla, M.D., reviewed and affirmed these findings. (R. at 104-07.)

### 6. The March 10, 2015 hearing and vocational expert testimony

As discussed in more detail in Section IV.B.1, infra, ALJ Bossong conducted a hearing on March 10, 2015 at which Plaintiff's attorney and representative, Mr. Frankel, was present but Plaintiff was not. (R. 57.)

On the record, Mr. Frankel explained to the ALJ that Plaintiff was "currently working doing a long-term assignment in

Chicago" and "she informed me this morning, without too much additional detail, that she was not able to get the flight that she had planned on taking to get back for the hearing today." (Id.) The ALJ indicated that "at least on first hearing of it, [this] doesn't seem to resemble something I would consider to be good cause. I think the best and most appropriate and fairest way to proceed here is to proceed with the hearing." (Id.) Mr. Frankel agreed. (R. at 58.) Mr. Frankel then briefly summarized Plaintiff's theory of the case and described her injury and alleged disabilities. (R. at 57-63.)

After Mr. Frankel's opening remarks, the ALJ examined a vocational expert ("VE"), subject to examination by Mr. Frankel. (R. at 60-70.) The ALJ first asked the VE if a hypothetical individual with the following characteristics would be able to perform Plaintiff's past relevant work:

> [L]imited to no more than light work; who would never climb ladders; never kneel; and never crawl. Furthermore, the person would be limited to no more than occasionally climbing stairs, balancing, stooping, or crouching. This individual would be further limited to no more than frequently reaching with the left both above the shoulder and waist to chest – no more than frequent – and also engage in fine finger manipulations no more than frequently; with no more than occasional exposure to pulmonary irritants or to extreme heat, cold, wetness or humidity.

(R. at 64.) The VE responded that such an individual could not perform work the way Plaintiff performed it in the past but could perform the work of a security guard "the way it's

normally performed . . . in any industry." (Id.) The ALJ then asked the VE if that same hypothetical individual "were able to lift and carry 20 pounds occasionally, 10 pounds frequently but were only able to walk [and] stand a total of three hours of six, out of the eight-hour work day . . . would such an individual be able to perform the security guard role. . . ." (R. at 64-65.) The VE answered that they would not. (R. at 65.)

The ALJ then asked if, based on the second hypothetical, there existed any work available for an individual with the Plaintiff's age, education, and work experience. (R. at 65-66.) The VE stated that such jobs existed, but that they would have to be sedentary. (R. at 66.) According to the VE, those jobs include surveillance-system monitor (1,320 jobs in the regional economy and 96,260 jobs in the national economy), table worker (5,160 jobs in the regional economy and 471,750 jobs in the national economy), and toy stuffer (4,470 jobs in the regional economy and 367,700 jobs in the national economy). (Id.) The VE stated that this hypothetical individual could not perform the job of toy stuffer if he or she could only finger and handle occasionally. (R. at 67.) The VE further stated that no jobs existed if that individual needed to be off task ten minutes out of every hour, needed to take three days of work off per month, or was "not able to sit for the full six hours in an eight-hour

day and would need to periodically elevate their legs two to four times a day." (R. at 66-68.)

### C. ALJ Decision

In a written decision dated July 17, 2015, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act at any time between February 1, 2011 and January 11, 2013 because, consistent with Plaintiff's age, education, work experience, and RFC, she was capable of working as a surveillance system monitor, table worker, or toy stuffer. (R. at 48.)

At the first stage of the five-step sequential evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity between February 1, 2011, the amended alleged onset date, and January 11, 2013, the date Plaintiff returned to substantial work. (R. at 24.)

Next, at step two, the ALJ determined that Plaintiff had the following "severe" impairments: lumbar degenerative disc disease, degenerative joint disease of the left knee, impingement of the left shoulder, diabetes with neuropathy in the wrists, and carpal tunnel syndrome. (Id.) The ALJ found the following impairments "non-severe" because "the record [did] not support a conclusion that they caused significant vocationally relevant limitations" during the closed period of disability: right hand degenerative arthritis, fibroids, thyroid nodule,

hypertension, cholecystitis, hepatic steatosis, asthma, obstructive sleep apnea, cervical sprain and strain, trochanteric bursitis of the left hip, and plantar fasciitis. (Id.) With respect to the latter category, the ALJ then examined Plaintiff's medical records and other relevant evidence, in significant detail, and described the reasons he found each impairment to be "non-severe." (R. at 24-30.)

At step three, the ALJ concluded that none of Plaintiff's impairments or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, including those set forth in Listings 1.02, 1.03, 1.04, 1.09, 9.00, 11.01, or 11.14. (R. at 30-31.)

Between step three and step four, the ALJ determined that Plaintiff possessed the RFC to perform "light work," as defined in C.F.R. §§ 404.1567(b) and 416.967(b), except that:

> [S]he could stand or walk for 3 hours in an 8 hour work day, sit for 6 hours in an 8 hour work day, never climb ladders, kneel or crawl, only occasionally climb stairs, balance, stoop, or crouch, only frequently finger, only frequently reach with the left upper extremity, only occasional exposure to extreme heat, cold, wetness, humidity and pulmonary irritants.

(R. at 31-32.)

In determining Plaintiff's RFC, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence

and other evidence," including Plaintiff's October 1, 2012 Adult Function Report. (R. at 32.) Although the ALJ found that Plaintiff's physical impairments "could reasonably be expected to cause the alleged symptoms," he concluded that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. at 32.) In doing so, the ALJ analyzed in great detail the medical evidence in the record with respect to each of Plaintiff's impairments. (R. at 24-30, 32-47.)

As discussed in Section IV.B.5, infra, the ALJ assigned "little weight" to the opinions of Plaintiff's treating orthopedic surgeon, Dr. Ross, after finding that "Dr. Ross' opinion is not consistent with the medical record as a whole." (R. at 45-47.) The ALJ gave "little weight" to Dr. Roman's opinions, "little weight" to Dr. Stellabotte's opinion, and "some weight" to the opinions of Dr. Malumed. (R. at 44-45.) The ALJ also considered the opinion of Plaintiff's physical therapist, Mr. Rice, and afforded it "some weight." (R. at 46.) Finally, the ALJ assigned "some weight" to the opinions of the State agency consultants in general, but gave "little weight" to the State agency consultants' opinion that Plaintiff could never crouch, never reach overhead, and occasionally reach overhead with her left upper extremity. (R. at 44.)

Based on Plaintiff's RFC and the VE's testimony from the March 10, 2015 hearing, the ALJ found, at step four, that Plaintiff was unable to perform any past relevant work. (R. at 47.) At step five, however, the ALJ found that there exists a significant number of jobs in the national and regional economy that Plaintiff can perform, including those of surveillance system monitor (1,320 jobs in the regional economy and 96,260 jobs in the national economy), table worker (5,160 jobs in the regional economy and 471,750 jobs in the national economy), and toy stuffer (4,470 jobs in the regional economy and 367,700 jobs in the national economy). (R. at 48.) Accordingly, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, between February 1, 2011 and January 11, 2013. (Id.)

## III. STANDARD OF REVIEW

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence." 42 U.S.C. § 405(g); see also Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 114 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." <u>Richardson v. Perales</u>, 402

U.S. 389, 400 (1971); <u>see</u> <u>also</u> <u>Hagans v. Comm'r of Soc. Sec.</u>,

694 F.3d 287, 292 (3d Cir. 2012) (using the same language as

<u>Richardson</u>). Therefore, if the ALJ's findings of fact are

supported by substantial evidence, those findings bind the

reviewing court, whether or not it would have made the same

determination. <u>Fargnoli</u>, 247 F.3d at 38. The Court may not weigh

the evidence or substitute its own conclusions for those of the

ALJ. <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 359 (3d Cir.

2011). Remand is not required where it would not affect the

outcome of the case. <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 553

(3d Cir. 2005).

**IV. DISCUSSION**

  **A.  Legal Standard for Determination of Disability**

In order to establish a disability for the purpose of

disability insurance benefits, a claimant must demonstrate a

"medically determinable basis for an impairment that prevents

him from engaging in any 'substantial gainful activity' for a

statutory twelve-month period." <u>Plummer v. Apfel</u>, 186 F.3d 422,

426 (3d Cir. 1999); 42 U.S.C. § 423(d)(1). A claimant lacks the

ability to engage in any substantial activity "only if his

physical or mental impairment or impairments are of such

severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy." Plummer, 186 F.3d at 427–428; 42 U.S.C. § 423(d)(2)(A).

The Commissioner reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." 20 C.F.R. § 1520(b). Present engagement in substantial activity precludes an award of disability benefits. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987). In step two, the claimant must demonstrate that the claimant suffers from a "severe impairment." 20 C.F.R. § 1520(c). Impairments lacking sufficient severity render the claimant ineligible for disability benefits. See Plummer, 186 F.3d at 428. Step three requires the Commissioner to compare medical evidence of the claimant's impairment(s) to the list of impairments presumptively severe enough to preclude any gainful activity. 20 C.F.R. § 1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Plummer, 186 F.3d at 428. Between steps three and four, the ALJ determines the claimant's RFC. See 20 C.F.R. § 404.1545. Step four requires the ALJ to consider whether, based on his or her RFC, the claimant retains the ability to perform past relevant work. 20 C.F.R. § 1520(e). If the claimant's impairments render

the claimant unable to return to the claimant's prior occupation, at step five the ALJ will consider whether the claimant possesses the capability to perform other work existing in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 1520(g), 404.1560(c).

**B. Analysis**

Plaintiff argues that the ALJ erred by: (1) failing to adjourn the hearing when Plaintiff was unable to attend due to her last-minute, work-related travel; (2) failing to properly consider several "non-severe" impairments in determining Plaintiff's RFC; (3) failing to properly evaluate Plaintiff's bilateral hand complaints; (4) misinterpreting factual statements in the May 24, 2011 FCE; and (5) discounting the opinion of Plaintiff's treating orthopedic surgeon. The Court addresses each argument in turn.

1. <u>The ALJ did not err in conducting the March 10, 2015 without Plaintiff present</u>

ALJ Bossong conducted a hearing on March 10, 2015 at which Plaintiff's attorney and representative, Mr. Frankel, was present but Plaintiff was not. (R. 56-70.) Plaintiff now argues that the ALJ erred by failing to follow SSA policy regarding the procedure that is to be followed when a claimant is unavailable for a hearing before the ALJ but her representative is present. (Pl. Br. at 15-18.) This argument is without merit.

The Social Security regulations provide that "[a]ny party to a hearing has a right to appear before the administrative law judge." 20 C.F.R. § 404.950(a). To that end, the regulations require that, once the date and time of the hearing are set, the ALJ must send a notice of hearing to the claimant's last known address at least 20 days before the hearing. 20 C.F.R. §§ 404.938(a), 419.1438. On January 12, 2015, Plaintiff acknowledged receipt of the Notice of Hearing and indicated she would be present at the March 15, 2015 hearing. (R. 167.) Three weeks later, the SSA mailed Plaintiff a reminder of the hearing and noted that "[i]f you do not appear at this hearing, and do not provide a good reason why you did not appear, the [ALJ] will **dismiss** your request for hearing without further notice. If the ALJ dismisses your request for hearing, the prior decision will become the final decision of the Commissioner on your application." (R. 170) (emphasis in original).

Plaintiff does not dispute that the ALJ fully and timely complied with the hearing notice requirements. Instead, Plaintiff argues that, "[o]ff the record, the ALJ presented counsel with the option to either dismiss the case or proceed in the absence of the Plaintiff" and that "[w]ithout the ability to secure Plaintiff's explicit consent on the matter, counsel was compelled to proceed without the Plaintiff." (Pl. Br. at 15.) This sequence of events, Plaintiff maintains, violated the

Social Security Administration's Hearings, Appeals, and Litigation Law Manuel ("HALLEX").[2] Even accepting <u>arguendo</u> that this off-the-record conversation took place, the ALJ did not err by providing Mr. Frankel with such a choice.

In relevant part, Section I-2-4(25)(D) of the HALLEX states:

> If an appointed representative appears at the scheduled hearing without the claimant and continues to represent the claimant during the hearing, dismissal is never appropriate. However, the ALJ may determine that the claimant has constructively waived the right to appear at the hearing if: (1) [t]he representative is unable to locate the clamant; (2) [t]he Notice of Hearing was mailed to the claimant's last known address; and (3) [t]he contact procedures required by 20 CFR 404.938 and 416.1437 . . . have been followed.

HALLEX I-2-4(25)(D)(2).[3] If the ALJ finds that the claimant has constructively waived the right to appear at the hearing:

> [T]he ALJ need not proceed with the hearing and may choose to issue a decision on the record. However, if medical expert or vocational expert testimony is needed to resolve the case, the ALJ may choose to proceed with the hearing,

---

[2] "Through HALLEX, the Associate Commissioner of Hearings and Appeals conveys guiding principles, procedural guidance and information to the Office of Hearings and Appeals . . . staff. HALLEX includes policy statements resulting from an Appeals Council <u>en banc</u> meeting under the authority of the Appeals Council Chair. It also defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council, and Civil Action levels." HALLEX § I-1-0-1, Purpose, http://www.socialsecurity.gov/OP_Home/hallex/I01/I-1-0-1.html. HALLEX provisions are available at http://www.ssa.gov/OP_Home/hallex/.

[3] <u>Available</u> <u>at</u> HALLEX § I-2-4-25, Dismissal Due to Claimant's Failure to Appear, https://www.ssa.gov/OP_Home/hallex/I-02/I-2-4-25.html#i-2-4-25-d.

accepting the testimony of the witness(es) and allowing the
appointed representative to question the witness(es) and
make arguments on the claimant's behalf.

HALLEX 1-2-4-25(D)(2)(a). Notably, the HALLEX also states that,
if the claimant has constructively waived his or her right to
appear at the hearing, "the ALJ will advise the appointed
representative, either on the record during the hearing or in
writing thereafter, that he or she will **not** send a Request to
Show Cause for Failure to Appear to the claimant because the
claimant has constructively waived the right to appear at a
hearing." Id.

As an initial matter, the Court notes that the Third
Circuit has emphatically held that "HALLEX provisions . . . lack
the force of law and create no judicially-enforceable rights."
Bordes v. Comm'r of Soc. Sec., 235 F. App'x 853, 859 (3d Cir.
2007); see also Schweiker v. Hansen, 450 U.S. 785, 789 (1981)
("[T]he Claims Manual is not a regulation. It has no legal
force, and it does not bind the SSA. Rather, it is a 13-volume
handbook for internal use by thousands of SSA employees.");
Moore v. Apfel, 216 F.3d 864, 868 (9th Cir. 2000) ("HALLEX is
strictly an internal guidance tool, providing policy and other
procedural guidelines to ALJs and other staff members. As such,
it does not . . . carry the force and effect of law."). Thus, a
violation of the HALLEX will not normally serve as a valid basis

for remand. See <u>Reed v. Barnehart</u>, 2008 WL 2835331, at *7
(D.N.J. July 18, 2008).

In any event, the record reflects that the ALJ
substantially complied with HALLEX 1-2-4-25(D) because Plaintiff
constructively waived her right to appear at the hearing. As
noted above, Plaintiff received a notice of the March 10, 2015
hearing and indicated that she would be present. (R. 167.) And
Plaintiff never notified the ALJ at any time prior to the
hearing date of a work conflict or otherwise indicated she would
be unable to attend the hearing. Instead, at the beginning of
the March 10, 2015 hearing, the following colloquy occurred:

> ALJ:    Now I take it that Ms. Ganges cannot be with us this
>         morning. Can you just – let's get on the record why
>         that is.
>
> ATTY:   Absolutely. She's currently working doing a long-
>         term assignment in Chicago. She hasn't changed
>         residences, but she does strike work. So she travels
>         where the work is. And she informed me this morning,
>         without too much additional detail, that she was not
>         able to get the flight that she had planned on
>         taking to get back for the hearing today.
>
> ALJ:    Okay. All right. Well, that being something that
>         doesn't – at least on the first hearing of it,
>         doesn't seem to resemble something would consider to
>         be good cause.[4] I think the best and most

---

[4] Where, as here, a claimant objects to the time or place of a
hearing less than five days before the date set for the hearing,
the Social Security regulations provide that "we will extend the
time period if you show you had good cause for missing the
deadline . . . us[ing] the standards explained in [Section]
416.1411." 20 C.F.R. § 416.1436. Under Section 416.1411, in
determining whether "good cause" exists, the ALJ considers: "(1)
[w]hat circumstances kept you from making the request on time;
(2) [w]hether our action misled you; (3) [w]hether you did not

> appropriate and fairest way to proceed here is to
> proceed with the hearing.

> ATTY:    **I'm in agreement.**

> ALJ:    So let's – let's do that. We can dispense with all
> the introductory remarks. You will not be testifying
> . . . you will be advocating, of course.

(R. 57-58) (emphasis added). Mr. Frankel subsequently confirmed

by way of the March 30, 2015 letter to ALJ Bossong that

Plaintiff was willing to proceed without being given the

opportunity to testify before the ALJ:

> A hearing was held before Your Honor on [March 10, 2015].
> Because the claimant was not present, we discussed the
> reason for her absence. As you noted, based on the
> information I had, you did not believe the good cause
> standard had been met. Rather than dismiss the case, we
> agreed to proceed with the hearing without the claimant's
> appearance. I have since confirmed that claimant has **no
> objection** to proceeding in this matter."

(R. 239) (emphasis added).

The record clearly indicates that Plaintiff, through her

attorney and representative, constructively waived the right to

appear at the hearing by failing to show good cause for her

absence. Plaintiff waited until the morning of the long-

---

understand the requirements of the Act resulting from amendments
to the Act, other legislation, or court decisions; and (4)
[w]hether you had any physical, mental, educational, or
linguistic limitations . . . which prevented you from filing a
timely request or from understanding or knowing the need to file
a timely request for review." 20 C.F.R. § 416.1411(a). Examples
of circumstances where good cause may exist are set forth in
Section 416.1411(b), and include situations such as "(2) [t]here
was a death or serious illness in your immediate family" or "(7)
[y]ou did not receive notice of the initial determination or
decision."

scheduled hearing to tell her attorney she would remain in Chicago and not appear. In fact, Plaintiff's attorney never requested an adjournment of the hearing on the record and, more importantly, several weeks after the hearing, Plaintiff's attorney reiterated that Plaintiff personally "has no objection to proceeding in this manner." (Id.) Thus, the ALJ appropriately decided this case on the record, accounting for the arguments put forth by Mr. Frankel at the March 10, 2015 hearing; the ALJ's decision to proceed in claimant's absence, but with the consent of claimant's attorney, was not an abuse of discretion.

2. <u>The ALJ adequately considered Plaintiff's "non-severe" impairments</u>

Plaintiff next argues that the ALJ failed to properly consider the impairments he determined to be "non-severe" in the formulation of Plaintiff's RFC in violation of SSR 96-8p. (Pl. Br. at 18-20.) Specifically, Plaintiff avers that the ALJ erred by overly relying on the absence of treatment during the relevant period with respect to Plaintiff's alleged fibroids and obstructive sleep apnea and ignored other evidence in the record. (Id. at 19-20.) To the contrary, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff's fibroids and obstructive sleep apnea were "non-severe" and, in any event, the ALJ properly analyzed these impairments in formulating Plaintiff's RFC.

At step two of the sequential elevation process, the ALJ must "determine whether an individual has a severe medically determinable physical or mental impairment or combination of impairments that has lasted or can be expected to last for a continuous period of at least 12 months or end in death." SSR 96-3p. For an adult, "[a] severe impairment is one that affects an individual's ability to perform basic work-related activities." Id. "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981) (internal citation omitted).

Even if the ALJ properly determines that a claimant's impairments are non-severe, however, a finding of non-severity does not eliminate those impairments from consideration of his or her overall ability to perform past work. Indeed, between steps three and four, the ALJ is required to assess **all** of the claimant's impairments - even ones that are not "severe" - in combination, when making the RFC determination. See 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as

explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."). SSR 96-8p is clear about what the ALJ must consider:

> In assessing RFC, the adjudicator **must** consider limitations and restrictions imposed by **all** of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

SSR 96-8p (emphasis added); see also Soboleski v. Comm'r of Soc. Sec., 2015 WL 6175904, at *2 (D.N.J. Oct. 20, 2015) (explaining that a finding of non-severity "does not obviate the need for a separate analysis of how Plaintiff's impairment affects her RFC"). The ALJ must therefore consider all relevant evidence when determining an individual's RFC. See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001).

Here, the ALJ found the following impairments to be "non-severe:" right hand degenerative arthritis, fibroids, thyroid nodule, hypertension, cholecystitis, hepatic steatosis, asthma, obstructive sleep apnea, cervical sprain and strain, trochanteric bursitis of the left hip, and plantar fasciitis. (R. at 24.) Plaintiff argues that the ALJ erred by not finding her alleged fibroids and obstructive sleep apnea to be "severe" at step two and by not including a limitation allowing for any

amount of time off task or decreased concentration in the formulation of Plaintiff's RFC. (R. at 19-20.)

As an initial matter, the Court finds that the ALJ's treatment of Plaintiff's fibroids and obstructive sleep apnea as "non-severe" is supported by substantial evidence. The record indicates that Plaintiff was last treated for fibroids on September 11, 2009, well before Plaintiff's alleged onset disability date, February 1, 2011. (R. at 676.) Moreover, with respect to Plaintiff's alleged obstructive sleep apnea, the record shows that Plaintiff underwent a sleep study on November 16, 2009 and received a CPAP machine at that time, but again there is no evidence that Plaintiff complained of or was treated for obstructive sleep apnea during the alleged closed period of disability. (R. at 275.) And, although Plaintiff contends that she was tired on exertion and needed to lie down on a daily basis (R. at 213; see also Pl. Br. at 20), she did not allege that it was because of her alleged obstructive sleep apnea. Simply, based upon substantial evidence upon the record, the ALJ reasonably found that Plaintiff's alleged fibroids and obstructive sleep apnea were "non-severe."

### 3. The ALJ adequately considered Plaintiff's hand symptoms in formulating the RFC

Third, Plaintiff argues that the ALJ erred by failing to account in the RFC for limitations stemming from Plaintiff's **bilateral** carpal tunnel syndrome. (Pl. Br. at 20-22.) According

to Plaintiff, the ALJ accounted only for impairments to her left hand, rather than both hands, in the RFC by limiting Plaintiff to frequent reaching with her left-upper extremity, but not her right. (Id. at 20.) To the contrary, the ALJ fully considered Plaintiff's alleged carpal tunnel syndrome in both hands (R. at 39-41) by limiting her to frequent fingering of objects with her left and right hand. (R. at 31-32.) To the extent the ALJ limited reaching with the left-upper extremity in the RFC, this was to account for limitations stemming from Plaintiff's left shoulder impairment for which she underwent an open left subacromial decompression on March 9, 2011. (R. at 36-38, 637.) Substantial evidence, including the findings in Plaintiff's May 2011 FCE (R. at 400-02), the results of a July 2, 2013 EMG (R. at 771-74), and a report by Dr. Bednar dated a January 13, 2014 (R. at 776-77) – all of which the ALJ considered and addressed in formulating the RFC (R. at 39-40) – supports the ALJ's treatment of Plaintiff's bilateral hand symptoms (i.e., limiting her to frequent fingering in both hands).

> ### 4. The ALJ's minor misstatement of the May 2011 FCE amounts to harmless error and does not warrant remand

Plaintiff next argues that the ALJ erred by erroneously stating "[t]he undersigned assigns great weight to Mr. Rice's opinion that the plaintiff could lift and carry 10 pounds; **she could lift objects over 10 pounds above shoulder height** and she

could occasionally climb stairs." (Pl. Br. at 22) (citing R. at 46) (emphasis added). In fact, Mr. Rice had opined that, because she was "**unable** to perform lifting tasks at or above shoulder height in excess of 10.0 lbs," Plaintiff could not resume her past relevant work as a Security Supervisor. (R. at 399) (emphasis added). Thus, the ALJ undoubtedly misstated the FCE. The Court finds, however, that this error is harmless because, consistent with the FCE, the ALJ ultimately concluded that Plaintiff could **not** resume her past relevant work but could perform light work. (R. at 46.) Accordingly, the Court will not remand on this basis. See Rutherford, 399 F.3d at 553 (remand not required "because it would not affect the outcome of the case").

### 5. Substantial evidence supports the ALJ's treatment of Dr. Ross's opinion

Finally, Plaintiff argues that the ALJ erred by failing to adequately explain his basis for discounting the opinion of Plaintiff's treating orthopedic surgeon. (Pl. Br. at 23-25) (citing R. at 45, 47) (assigning "little weight" to Dr. Ross's opinions). The Court finds that substantial evidence supports the ALJ's treatment of Dr. Ross's opinions.

"[T]he ALJ — not treating or examining physicians or State agency consultants — must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361; see also 20 C.F.R §§ 404.1527(e)(1). The ALJ is entitled to weigh all the evidence in

making his or her finding. <u>Brown v. Astrue</u>, 649 F.3d 193, 196 (3d Cir. 2011). It is established that "[a]lthough treating and examining physician opinions often deserve more weight . . .'[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity.'" <u>Chandler</u>, 667 F.3d at 361 (quoting <u>Brown</u>, 649 F.3d at 197 n. 2). Where inconsistency in evidence exists, the ALJ retains significant discretion in deciding whom to credit. <u>Plummer</u>, 186 F.3d at 429. However, the ALJ "cannot reject evidence for no reason or for the wrong reason." <u>Id.</u> (quoting <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir. 1993)); <u>Cotter</u>, 642 F.2d at 704-05.

Here, the ALJ thoroughly discussed all of the medical evidence of record, including Dr. Ross's findings and recommendations, in his decision. (R. at 24-30, 31-47.) Ultimately, the ALJ assigned "little weight" to Dr. Ross's opinions after finding "that Dr. Ross' opinion is not consistent with the medical record as a whole." (R. at 47.) For example, Dr. Ross opined that Plaintiff's pain was occasionally intractable, usually present, and of such a degree as to prevent Plaintiff from performing normal, full-time work activities on a frequent basis. (R. at 46) (citing R. at 780.) This, the ALJ explained, was inconsistent with the fact that, in August 2011, Plaintiff was discharged from aqua therapy because she met all

of her goals (R. at 47) (citing R. at 489), and that following treatment with Dr. Sciammana in September 2011, Plaintiff experienced a 70 percent improvement in her pain levels. (R. at 47) (citing R. at 599.) Moreover, Plaintiff returned to substantial work in January 2013 (R. 239-40), several months before Dr. Ross completed her MSS in September 2013. (R. at 779-87.) Accordingly, substantial evidence supports the ALJ's decision to assign little weight to Dr. Ross's opinion.

## V. CONCLUSION

For the foregoing reasons, the ALJ's decision will be affirmed. An accompanying order will be entered.


**October 29, 2018**          **s/ Jerome B. Simandle**
Date                          JEROME B. SIMANDLE
                              U.S. District Judge